1

2

3

4

5

6

7

8                       UNITED STATES DISTRICT COURT

9                   FOR THE EASTERN DISTRICT OF CALIFORNIA

10

11   LEON E. MORRIS,                          No.  2:13-cv-0589 JAM CKD P

12              Plaintiff,

13        v.                                  ORDER &

14   C. M. GREEN.,                            FINDINGS AND RECOMMENDATIONS

15              Defendant.

16

17   I. Introduction

18        Plaintiff, a state prisoner proceeding pro se, has filed this civil rights action seeking relief

19   under 42 U.S.C. § 1983.  This action proceeds against defendant Green on the complaint filed

20   March 26, 2013.  (ECF No. 1 ("Compl."); see ECF No. 20.)  On December 9, 2015, defendant

21   was granted summary judgment on all but one claim due to plaintiff's failure to exhaust

22   administrative remedies.  (ECF No. 68.)  In the remaining claim, plaintiff alleges that defendant

23   retaliated against him by not sending his legal mail in December 2011.  (Id.)

24        Before the court are the parties' cross-motions for summary judgment.  (ECF Nos. 54 &

25   74; see ECF No. 76.)  After careful consideration of the arguments and the record, the

26   undersigned will recommend that defendant's motion for summary judgment be granted.

27   ////

28   ////

                                    1

1  II.  Summary Judgment Standards Under Rule 56

2        Summary judgment is appropriate when it is demonstrated that there "is no genuine

3  dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R.

4  Civ. P. 56(a).  A party asserting that a fact cannot be disputed must support the assertion by

5  "citing to particular parts of materials in the record, including depositions, documents,

6  electronically stored information, affidavits or declarations, stipulations (including those made for

7  purposes of the motion only), admissions, interrogatory answers, or other materials. . ."  Fed. R.

8  Civ. P. 56(c)(1)(A).

9        Summary judgment should be entered, after adequate time for discovery and upon motion,

10  against a party who fails to make a showing sufficient to establish the existence of an element

11  essential to that party's case, and on which that party will bear the burden of proof at trial.  See

12  Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986).  "[A] complete failure of proof concerning an

13  essential element of the nonmoving party's case necessarily renders all other facts immaterial."

14  Id.

15        If the moving party meets its initial responsibility, the burden then shifts to the opposing

16  party to establish that a genuine issue as to any material fact actually does exist.  See Matsushita

17  Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986).  In attempting to establish the

18  existence of this factual dispute, the opposing party may not rely upon the allegations or denials

19  of their pleadings but is required to tender evidence of specific facts in the form of affidavits,

20  and/or admissible discovery material, in support of its contention that the dispute exists or show

21  that the materials cited by the movant do not establish the absence of a genuine dispute.  See Fed.

22  R. Civ. P. 56(c); Matsushita, 475 U.S. at 586 n.11.  The opposing party must demonstrate that the

23  fact in contention is material, i.e., a fact that might affect the outcome of the suit under the

24  governing law, see Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986); T.W. Elec. Serv.,

25  Inc. v. Pacific Elec. Contractors Ass'n, 809 F.2d 626, 630 (9th Cir. 1987), and that the dispute is

26  genuine, i.e., the evidence is such that a reasonable jury could return a verdict for the nonmoving

27  party, see Wool v. Tandem Computers, Inc., 818 F.2d 1433, 1436 (9th Cir. 1987).

28  ////

2

In the endeavor to establish the existence of a factual dispute, the opposing party need not establish a material issue of fact conclusively in its favor.  It is sufficient that "the claimed factual dispute be shown to require a jury or judge to resolve the parties' differing versions of the truth at trial." T.W. Elec. Serv., 809 F.2d at 631.  Thus, the "purpose of summary judgment is to 'pierce the pleadings and to assess the proof in order to see whether there is a genuine need for trial.'" Matsushita, 475 U.S. at 587 (quoting Fed. R. Civ. P. 56(e) advisory committee's note on 1963 amendments).

In resolving the summary judgment motion, the evidence of the opposing party is to be believed.  See Anderson, 477 U.S. at 255.  All reasonable inferences that may be drawn from the facts placed before the court must be drawn in favor of the opposing party.  See Matsushita, 475 U.S. at 587.  Nevertheless, inferences are not drawn out of the air, and it is the opposing party's obligation to produce a factual predicate from which the inference may be drawn.  See Richards v. Nielsen Freight Lines, 602 F. Supp. 1224, 1244-45 (E.D. Cal. 1985), aff'd, 810 F.2d 898, 902 (9th Cir. 1987).  Finally, to demonstrate a genuine issue, the opposing party "must do more than simply show that there is some metaphysical doubt as to the material facts . . . .  Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no 'genuine issue for trial.'" Matsushita, 475 U.S. at 587 (citation omitted).

III. Analysis

A. Allegations

In his verified complaint, plaintiff alleges as follows:

Defendant Green was a prison guard at California State Prison-Sacramento.  (Compl. at 3.)  Beginning in November 2010, defendant and others "retaliated against me for filing 602 staff complaints and writing the warden about the various wrongs they subjected me to."  (Id. at 4.)

> In November 2010, . . . guard C.M. Green came to the cage I was kept in and started shouting [at] me, ranting and cussing me up one side and down the other about a 602 staff complaint I'd filed against him.  Telling me I'd be sorry and regret; saying he don't appreciate it.  Immediately thereafter, him and his nefarious cohort started a relentless never-ending campaign of retaliation against me.

(Id. at 5.)

3

On December 28, 2011, plaintiff put legal documents inside an envelope to be mailed to the Loyola Law School Innocence Project.  (Id.)  He addressed the envelope and handed it to defendant Green to mail.  (Id.)  Plaintiff later saw the envelope sitting on defendant's desk and reminded him to mail it, "cause it's very important and the last copy of everything I've got and I'm trying to prove my innocence[.]"  (Id.)  Defendant told him he would take it to the mailroom.  (Id. at 5-6.)  Plaintiff later learned that the Innocence Project did not receive his documents.  (Id. at 6.)  He contacted the prison mailroom, which sent him a list of all his outgoing and incoming mail; the letter to Innocence Project was not listed, indicating to plaintiff that his letter was never taken to the mailroom.  (Id.)  Plaintiff claims defendant failed to mail his letter in retaliation for plaintiff's November 2010 staff complaint.  (Id.)

B. Facts

The following facts are undisputed unless otherwise noted:

At all relevant times, plaintiff was an inmate at California State Prison-Sacramento, where defendant worked as a correctional officer.  (ECF No. 54-4, Plaintiff's Statement of Undisputed Facts ("PUF") 1-2.)  During the month of November 2010, plaintiff was housed in CSP-Sac's A-4 Psychiatric Services Unit ("PSU"), where defendant worked as a Floor Officer during Second Watch.  (ECF No. 74-3, Green Decl., ¶¶ 3-4.)  During the time he worked in PSU, defendant's interactions with plaintiff mainly consisted of the following: bringing him his meals; responding if plaintiff called him to his cell; responding to plaintiff's requests for interviews, items, or services; escorting plaintiff to the law library and to groups; bringing him supplies, and occasionally escorting him to the shower.  (Green Decl., ¶ 5.)

On or about November 27, 2010, plaintiff filed a 602 inmate appeal against defendant for not allowing him to shave.  (ECF No. 74-1, Defendant's Statement of Undisputed Facts ("DUF") 1.)  According to defendant, despite the fact that PSU inmates were not allowed to receive razors or shave on their own, PSU staff, including defendant, allowed plaintiff to shave approximately three times a week "as a courtesy" (Green Decl., ¶¶ 7-9); plaintiff contends he had a medical chrono to shave.  One Friday in November 2010, plaintiff's request to shave was denied.  (Id., ¶¶ 9-10.)  Plaintiff filed a 602 staff complaint against defendant for not allowing him to shave;

1   however, defendant had not been working on that Friday.  (PUF 7; DUF 10).

2         On November 27, 2010, defendant came to plaintiff's cell and questioned him for filing

3   the inmate appeal against him.  (DUF 2.)  Plaintiff declares that defendant "began ranting,

4   screaming, and cussing me out about the 602 grievance I had filed against him and some of his

5   guard cohorts.  Defendant said I should not have put his name in the 602 and I would pay for it."

6   (ECF No. 54 at 12, Morris Decl.; see also Compl. at 5.)  Defendant concedes that he raised his

7   voice during the conversation because he was not working on the day plaintiff complained about;

8   however, he denies that he swore at plaintiff or told him he would "regret" or "be sorry for" filing

9   a staff complaint against him.  (Morris Decl., ¶ 11.)

10        In the thirteen months between this incident and December 2011, plaintiff and defendant

11  had no significant interactions.  (DUF 6.)  In his deposition, plaintiff stated that he believed the

12  December 2011 mail incident was related to the November 2010 dispute about the shaving

13  chrono "because there was no other incident that had occurred between here and now.  Because I

14  hadn't said ten words to Green since that day he cursed me out."  (ECF No. 74-4, Pl.'s Dep. p.

15  146:12-147:8.)

16        On December 28, 2011, while working as a Floor Officer during Second Watch at CSP-

17  SAC's Correctional Treatment Center I ("CTC-I"), defendant took plaintiff out of his normal cell

18  and into a holding cell so that plaintiff could write a letter to the Loyola Innocence Project.  (DUF

19  3.)  After plaintiff wrote the letter, he gave it to a Recreation Therapist, who gave it to defendant

20  to mail on plaintiff's behalf.  (DUF 4.)  Plaintiff testified in deposition that he watched defendant

21  put tape on it and put it on his office desk.  (Pl. Dep. p. 56:12-16.)  Plaintiff testified that he told

22  defendant to make sure and mail the letter because plaintiff's freedom depended on it, and

23  defendant assured him he was going to mail it.  (Pl. Dep. p. 57:6-18.)

24        Defendant declares:

25              Mail in CTC-I would customarily go out during Third Watch.  If an
              officer on Second Watch, such as myself, received an outgoing
26              letter from an inmate, he would place it in a prominent location for
              Third Watch staff to notice, pick up, place in a mail bag, and take to
27              the mail room.  (Typically, I would tape the letters to the inside
              window of the CTC-I Office, in plain sight, so that Third Watch
28              staff would easily see it.)  Second Watch staff did not have a mail

bag, which is why Third Watch staff was responsible for taking mail to the mailroom.

Although I do not recall all the particulars of this incident, I do remember receiving a letter to mail on behalf of Morris. I do not recall whether Morris told me what was in the letter or why it was important, but I do recall telling him not to worry and that I would make sure it was mailed out.

. . .

I do not know what happened to Plaintiff's letter after I placed it in the CTC-I Office for Third Watch staff to mail out. As a Correctional Officer on Second Watch in CTC-I, I was not responsible for delivering inmate letters to the mailroom. I did not throw away plaintiff's letter.

At that time, outgoing legal mail was not logged in the CTC-I log book. I am informed that outgoing legal mail was separately logged in the mailroom log book, but I was neither personally involved nor responsible for this task.

(Green Decl., ¶¶ 16-21.) Defendant further declares that, prior to the events of November 27, 2010, he never had a negative experience with plaintiff, and that he bore plaintiff no ill-will as a result of the November 2010 grievance. (Green Decl., ¶ 22.) Defendant declares that "[o]fficers are regularly subject to inmate appeals being filed against them, and it is expected in the course of an officer's employment." (Id.)

In an August 8, 2012 response to plaintiff's inmate appeal concerning his letter to the Innocence Project, the Warden of CSP-Sacramento wrote: "The SAC Mailroom is aware of your claim to have missing legal documents, has searched the Mailroom, but did not find any documents matching your description. If found the Mailroom staff will return your documents to you as soon as possible." (ECF No. 54 at 28.)

C. Legal Standard

To establish a First Amendment retaliation claim, plaintiff must show: (1) an adverse action against him; (2) because of; (3) his protected conduct, and that such action; (4) chilled his exercise of his First Amendment rights; and (5) the action did not reasonably advance a legitimate correctional goal. Rhodes v. Robinson, 408 F.3d 559, 567–68 (9th Cir. 2005).

////

6

When adverse acts cause only de minimis harm, they are insufficient to support a § 1983 claim for retaliation.  See Rhodes, 408 F.3d at 567, n.11 ("If Rhodes had not alleged a chilling effect, perhaps his allegations that he suffered harm would suffice, since harm that is more than minimal will almost always have a chilling effect.") (emphasis added).  In Cenas v. Blanas, 2009 WL 3786078, *5 (E.D. Cal. Nov. 10, 2009), the court reasoned that "there have to be some limits placed on what constitutes a sufficiently adverse act for purposes of retaliation."  See id. at **4-5 (recommending summary judgment for defendant on retaliation claim because "the denial of access to showers, television and telephones for two, non-consecutive days is a de minimis hardship."), findings and recommendations adopted by district court March 9, 2010.  Accord Brown v. Runnels, 2006 WL 1305277, * (E.D. Cal. May 11, 2006) (recommending summary judgment for defendant on retaliation claim where defendant's allegedly retaliatory two-month delay in providing plaintiff with typewriter ribbon caused de minimis harm), findings and recommendations adopted by district court on Sept. 11, 2006; Dicey v. Hanks, 2015 WL 4879627, *5 (E.D. Cal. Aug. 14, 2015) ("An adverse action does not have to constitute an independent constitutional violation, but it does have to constitute more than minimal harm.") (finding plaintiff failed to state retaliation claim based on defendant's denial of an inmate grievance, which does not "constitute[] an adverse action that is more than de minimis").

D. Discussion

To proceed on a First Amendment retaliation claim, plaintiff must show there is a genuine dispute of fact as to whether defendant (1) took an adverse action against him (2) because of (3) his protected conduct, among other elements.  Resolving all evidentiary disputes in plaintiff's favor, the court assumes that defendant cursed at plaintiff in November 2010 about the shaving grievance and told plaintiff he would be "sorry" for naming him in the grievance, or words to that effect.  Then thirteen months passed without any significant interactions between the parties.

In December 2011, defendant was the last person known to possess plaintiff's letter to the Loyola Law School Innocence Project, which – resolving all inferences in plaintiff's favor – never made it to the mailroom.  Defendant denies throwing the letter away and claims he left it in the staff office for the next shift to mail.  Plaintiff assumes defendant threw it out in retaliation for

7

1   plaintiff's filing a grievance against him thirteen months earlier.

2   On this record, it is mere speculation that defendant took an adverse action against

3   plaintiff because of his protected conduct.  There is no direct evidence that defendant took any

4   adverse action against plaintiff at all, and defendant declares that he did not throw out plaintiff's

5   letter.  Nor is there evidence that defendant maintained a grudge against plaintiff for thirteen

6   months based on the filing of one grievance.  Rather, plaintiff testified there was no other incident

7   and they barely exchanged "ten words" during that time, while defendant declares that inmate

8   grievances are expected and he bore plaintiff no lasting ill-will.  No evidence suggests the parties

9   remained in conflict, such that defendant might seize upon an opportunity to harm plaintiff more

10  than one year later.  See Nagast v. Dept. of Corrections, 2012 WL 1458241, *6 (C.D. Cal. Feb.

11  28, 2012) (plaintiff failed to state retaliation claim where "[a]bsent some connection between

12  Plaintiff's filing of the lawsuit and his receipt of a disciplinary infraction over one year later, the

13  Court cannot infer that the disciplinary infraction (or any of the other subsequent bad things that

14  happened to Plaintiff) was retaliatory."), findings and recommendations adopted by district court

15  April 26, 2012.

16  Even assuming there was a genuine dispute of fact as to these elements, however, the

17  failure to mail one letter is a de minimis harm.  Plaintiff's mail log shows that in 2010 and 2011,

18  he sent numerous letters to attorneys and legal organizations including, e.g., The Prison Law

19  Office, The National Lawyers' Guild Prison Law Project, The Innocence Project (National), and

20  the Center for Constitutional Rights.  (ECF No. 54 at 36-38).  Plaintiff alleges that the lost letter

21  contained "the last copy of everything I've got" in an attempt to prove his innocence, including

22  "legal documents of the arrest, police statements, investigative statements, doctor reports, the

23  attorney timeline . . . [and] my recollection of the event."  (Pl.'s Dep., p. 169:18-170:4.)  Insofar

24  as these documents are in the record of plaintiff's criminal case, plaintiff likely could obtain

25  additional copies through the courts.  In any case, plaintiff has not raised the inference that, had

26  his letter to the Loyola Law School Innocence Project been mailed, it would have made any

27  appreciable difference to his sentence or conviction.

28  ////

8

In sum, plaintiff's suffering a de minimis harm more than one year after his protected conduct does not create a genuine dispute over whether his First Amendment rights were violated. Thus the undersigned will recommend that defendant's motion for summary judgment be granted.

IV.  <u>Plaintiff's Motions</u>

On June 29, 2016, plaintiff filed a motion to vacate all orders issued within the past three months and temporarily stay this action.  (ECF No. 80.)  Defendant opposed the motion.  (ECF No. 81.)  Plaintiff filed a second, similar motion on July 13, 2016.  (ECF No. 82.)

Plaintiff was hospitalized and unable to litigate this case between March 17, 2016 and June 20, 2016.  (<u>See</u> ECF No. 80 at 4.)  He has "ongoing serious mental health problems" and is awaiting a temporary transfer to another facility for a higher level of care.  (<u>Id.</u> at 2, 5.)  Plaintiff requests that all rulings that issued during his hospitalization be vacated and this action stayed until he returns from his temporary transfer.  (ECF No. 82 at 1-2.)

The relevant background is as follows: Plaintiff moved for summary judgment on June 16, 2015.  (ECF No. 54.)  His 43-page filing included a statement of undisputed facts, declarations, administrative appeal documents, mailroom records, and applicable legal standards.  (<u>Id.</u>) Defendant filed a cross-motion for summary judgment on February 11, 2016, approximately one month before plaintiff was hospitalized.  (ECF No. 74.)  On March 4, 2016, plaintiff moved for an extension of time, explaining that he had been hospitalized for an unknown period of time and requesting "at least a six month extension of time to October 30, 2016" to oppose defendant's motion.  (ECF No. 75.)  The court partially granted plaintiff's request, allotting 45 days to file an opposition to defendant's cross-motion for summary judgment and further providing: "If plaintiff is unable to file an opposition within 45 days, the court will consider the arguments and evidence in plaintiff's pending motion for summary judgment (ECF No. 54) in opposition to defendant's motion."  (ECF No. 76.)

Plaintiff did not file an opposition, and the undersigned considered plaintiff's evidence and arguments on summary judgment as set forth above.  Plaintiff does not claim there is additional evidence he could marshal in opposition, and the court does not find good cause to vacate any earlier order.  Thus plaintiff's motions to vacate previous orders and stay this action

1  will be denied.

2      Accordingly, IT IS HEREBY ORDERED that:

3      1. Plaintiff's motion to stay (ECF No. 80) is denied; and

4      2. Plaintiff's motion to vacate all orders and stay proceedings (ECF No. 82) is denied.

5      IT IS HEREBY RECOMMENDED that:

6      1. Plaintiff's motion for summary judgment (ECF No. 54) be denied; and

7      2. Defendant's motion for summary judgment (ECF No. 74) be granted and this case

8  closed.

9      These findings and recommendations are submitted to the United States District Judge

10 assigned to the case, pursuant to the provisions of 28 U.S.C. § 636(b)(l).  Within fourteen days

11 after being served with these findings and recommendations, any party may file written

12 objections with the court and serve a copy on all parties.  Such a document should be captioned

13 "Objections to Magistrate Judge's Findings and Recommendations."  The parties are

14 advised that failure to file objections within the specified time may waive the right to appeal the

15 District Court's order.  Martinez v. Ylst, 951 F.2d 1153 (9th Cir. 1991).

16 Dated:  July 28, 2016

17                                    _____
                                      CAROLYN K. DELANEY
18                                    UNITED STATES MAGISTRATE JUDGE

19

20

21 2 / morr0589.sj

22

23

24

25

26

27

28

                                      10